NORVELL, Justice.
Respondent’s motion for rehearing is overruled. We adhere to our order reverS' *20 ing the judgments of the Court of Civil Appeals and the District Court and remanding this cause to the latter court for another trial. However, the opinion handed down in this cause on March 13, 1963, is withdrawn and the following substituted therefor:
The trial court granted a summary judgment in favor of plaintiff, Dan W. Kinsel, Jr., and against defendant Valley Stockyards Company, for $17,451.02, upon the theory that the stockyards company had converted 158 head of Kinsel’s cattle. The Court of Civil Appeals affirmed, 360 S.W.2d 817.[1]
It is doubtful if much is gained by attempting to dispose of a case of this type by use of the summary judgment procedure. A restatement, exception, or a refinement of a rule of law is not involved, but rather the application of a rule of law to a particular factual situation. The controlling question is whether or not at the time Kinsel delivered the 158 head of cattle to a cattle trader named Will Ed. Wiley, he intended that title to the cattle should pass to the said Wiley. Seemingly, it would not be a very difficult task to determine this issue upon a preponderance of the evidence basis, where the trier of facts would be entitled to consider the credibility of witnesses and the weight to be given their testimony. However, it is another thing to determine from affidavits and deposition statements which are equivocable in nature and subject to varying inferences whether or not a genuine fact issue is .raised. In determining this issue, the same rule is applied as that used to test the evidence in a conventional trial in deciding whether or not an instructed verdict should be given. The evidence (the affidavit and deposition statements) must be viewed in the light most favorable to Valley Stockyards Company, the party against whom the judgment was rendered. When statements and circumstances are subject to more than one inference or interpretation, that version most favorable to the petitioner must be accepted. In other words, the judgments of the courts below must be reversed unless we can say that it appears conclusively as a matter of law that at the time the cattle were delivered to Wiley, Kinsel did not intend that title should pass.
It appears that after the cattle had been weighed and delivered to Wiley, and the amount of money due Kinsel had been finally computed, Wiley delivered a check for the calculated purchase price to Kinsel. The check was not honored by the bank upon which it was drawn. It is Kinsel’s contention that he never parted with title to the cattle; and consequently when Valley Stockyards purchased the cattle from Wiley (without notice of Kinsel’s claim) and resold the cattle in the usual course of business, the stockyards company became liable to Kinsel as a converter.
In our opinion this proposition cannot be sustained. A jury might well agree with it, but the problem is one for the trier of facts and cannot be resolved as a matter of law.
This brings us to a somewhat detailed consideration of the facts. Wiley did not testify. Both Kinsel and Valley Stockyards Company were victims of a swindle which was perpetrated by him, and he had apparently decamped to parts unknown. Kinsel’s deposition statements are all that were available to show the nature of the transaction between him and Wiley. He was a highly interested witness, and hence his statements need not necessarily be credited, unless, of course, they could have been easily contradicted if untrue. A jury would be entitled to accept a portion of Kinsel’s testimony and reject other portions. With these rules in mind and viewing the affidavit and deposition statements *21 in the light most favorable to petitioner, we make the following statement of the facts:
Kinsel had known Wiley for more than a year. He knew that Wiley was a “trader in livestock,” — that is, that he bought cattle for resale. He said he did not know what Wiley intended to do with the cattle which were the subject matter of this lawsuit, but it may be inferred from his account of his past dealings with Wiley that he knew that a resale of the cattle would take place shortly after he delivered the cattle to Wiley. In fact, he testified that in attempting to trace the cattle after their sale to Wiley, he discovered that certain cattle delivered to Wiley on Friday, November Sth, had been sold the following day in at least two separate sales yards in the Lower Rio Grande Valley. Kinsel met Wiley in the spring of 1960; and before the transaction of November 5th and 6th, 1961, which gave rise to this lawsuit, he had sold Wiley two or three bunches of his own cattle and one bunch of cattle owned by a partnership in which he had an interest. In none of these previous transactions had he delivered a bill of sale to Wiley. Kinsel testified that in selling cattle, he very seldom delivered a bill of sale, but that there were a number of “bill of sale drafts that are given and that sort of thing for cattle.” He was evidently referring to “a form of instrument (sometimes) used where a bill of sale is given and is conditioned upon the draft’s being honored.” Kinsel in all his transactions with Wiley including the one which is the subject matter of this litigation accepted ordinary bank checks signed by Wiley.
The sale here in dispute took place on November 4th and 5th of 1961. The cattle were sold by the pound, and the terms of the sale were agreed to on Friday, November 4th. The cattle were delivered by Kin-sel to Wiley in installments. Kinsel lived in Cotulla in La Salle County. He transported the cattle by truck to Encinal where they were weighed and delivered to Wiley. About 69 head were delivered on Friday, the fourth, and the remainder (89 head) on Saturday, the fifth. After the delivery of the final installment of cattle on Saturday, Wiley came to Kinsel’s home near Cotulla where the amount due for the cattle under the agreement of the parties was figured up, and Wiley delivered Kinsel his check for such amount. This was late in the afternoon of the fifth.
Kinsel’s deposition testimony hearing directly upon the delivery of the cattle and the acceptance of the check was as follows:
“Q: And, of course, he paid by check on November 4th and 5th for the cattle he got at that time? A: That is right.
“Q: And, of course, if this hadn’t been acceptable to you, you wouldn’t have delivered the cattle to him, would you? The payment by check. A: I delivered the cattle to him, yes.
“Q: That is what I mean. If it hadn’t been acceptable, you wouldn’t have delivered him the cattle? A: I guess the delivery speaks for that, doesn’t it.
“Q : Well, I am just trying to get you to say so. That is all. In other words, when he delivered you the check, the cattle were paid for and you delivered him the cattle and you knew he was taking them off from your ranch ? A: When he gave me a check, I delivered him the cattle, yes, that is right, and he took the cattle.
“O': And you accepted the check in payment for the cattle? A: I accepted the check for the cattle, yes.
“Q: Now, I guess you told Will Ed that these weren’t his cattle until the check cleared the bank, didn’t you? A: I don’t recall telling him that.
*22 “Q: Well, if you had told him under the circumstances, you would have recalled it, would you not? A: I suppose I would.
“Q: You didn’t say for instance, ‘Now, Will Ed, you hold on to these cattle until this check clears,’ did you? A: No, I didn’t say anything of that nature.
“Q: Well, you said that now that you didn’t tell Will Ed not to dispose of the cattle when he purchased them, is that correct? A: No, I didn’t tell him.
“Q: In other words, it was unconditional delivery by you to him of the cattle? I mean you turned them over to him knowing he was going to put them in the trucks and take them off? A: That is right.
“Q: It was unconditional? A: I turned them over to him knowing that he was going to put them in the trucks and take them off, that is right.
“Q: And when he took them off in the truck, you knew, knowing by having known Will Ed, that he was likely to take them to a sale yard and sell the cattle? A: I did not know what he was going to do with the cattle.
“Q: Well, I know that you said he didn’t specifically tell you but you knew that he was in that business and that he very likely would take at least part of them to a sale yard and sell them? A: I will say I knew there was possibility that he would put them in a sale yard. I didn’t know what he was going to do with them. Possibility of him doing nearly everything with a group of cattle just like anybody, or any time you sell cattle, you don’t know exactly what you are going to do with them. They won’t tell you.
“Q: Well, even knowing that possibility, you didn’t make any statement to him in connection with the check being honored, you delivered the cattle to him unconditionally and accepted his check in payment ? A: I delivered the cattle to him and accepted his-check and he put them in his-truck and hauled them off, yes-sir.
“Q: All right. And he put them in his-truck and you knew that is what: he was going to do ? A: I didn’t, know what he was going to do. with the cattle.
“Q: That he was going to put them ini the truck and haul them off? A:: That is right.
“Q: He wasn’t going to leave them' there? A: That is right.”
Respondent relies upon the general rule that where a cash sale is involved and personal property is delivered in exchange for a check, there is a presumption that the parties did not intend that title to. the property should pass until the check was honored by the drawee bank. Lang v. Rickmers, 70 Tex. 108, 7 S.W. 527; Middlekauff v. State Banking Board, 111 Tex. 561, 242 S.W. 442; Berlowitz v. Standley, 117 Tex. 362, 5 S.W.2d 963; Muldrow v. Texas Frozen Foods, Inc., 157 Tex. 39, 299 S.W.2d 275. This presumption, however, is not conclusive but may be rebutted. If a jury could conclude from the evidence now in the affidavit and deposition form that the delivery of the cattle was made with the intention of passing title to Wiley at that time, it would necessarily follow that Valley Stockyards could not be held liable as a converter by purchasing the cattle from *23 Wiley. Unless we are prepared to say that an intention to pass title at time of delivery must be shown by an expressed agreement to overcome the presumption above noticed, then we must hold that the circumstances disclosed in the present record are sufficient to take the case to the jury. In our opinion, circumstances may be relied upon to overcome the presumption. Here a contract was made. This was followed by delivery of a number of truckloads of cattle extending over a two-day period. The delivery was made to a “cattle trader,” and it is possible, if not probable, that some of the cattle were resold by Wiley before the check had been delivered. Kinsel said that he “accepted the check for the cattle.” A jury could conclude that, in view of the past dealings and relationship between the parties, it was their intention that as soon as the weight of each particular lot of cattle was ascertained and the cattle were loaded into the trucks which Wiley had provided, they became Wiley’s property to sell and dispose of as he saw fit; that is, that title to the cattle passed to Wiley with delivery of possession, and that thereby a debt arose payable when the weight of the entire lot of cattle sold had been ascertained and the full amount of payment had been calculated.
Kinsel seems to have treated the check as a cash item after he received it on November 5th. He did not deposit it in a bank for collection, but on the contrary delivered it to his creditor, Winter Garden Production Credit Association, as a partial payment upon an indebtedness due to such Association.
We think petitioner’s contention that there is a genuine issue of fact involved in the case has support in the authorities.
While the facts stated in the opinion of this Court in MacDonald v. Carlisle, 146 Tex. 206, 206 S.W.2d 224, are stronger than those disclosed by the present record, it was there held as a matter of law that although the check given by MacDonald to Carlisle and wife for a royalty deed was dishonored by the bank upon which it was drawn, nevertheless the title to the property described in the deed passed to MacDonald upon acceptance of the check by the Carlis-les. This Court said:
“Their course with respect to the check after receiving it, together with their testimony, discloses that they accepted it unequivocally. * * * MacDonald’s check, or draft, was actual payment for the royalty interest described in the deed since the circumstances disclose that both MacDonald and the Carlisles so intended.”
The question of whether a sale is absolute or conditional may often be one of fact. In Continental Bank & Trust Co. v. Hartman, Tex.Civ.App., 129 S.W. 179, no writ history, it was said:
“The next question is: Did the undisputed evidence show that plaintiffs sold the cotton in question unconditionally with the intention of passing the title, or if sold upon condition that it should be paid for in cash, such condition, after delivery, was waived? We do not think the testimony conclusively established either such a sale or such waiver. On the contrary, we think that whether the sale of plaintiffs’ cotton was to be for cash, and payment a condition precedent to the passage of title or whether, if such payment was a condition precedent to the vesting of title in Fletcher & Son, such condition was by the acts of plaintiffs waived, were questions of fact for the determination of the jury. That a sale of personal property made for cash, the delivery thereof being subject to the condition of a cash payment being made, passed no title, seems to be a well-settled principle. It is equally well settled that such a condition may be waived by the seller, and that in such event the title passes, and he cannot thereafter reclaim the possession of the goods. This condition of payment or its waiver may be either express or implied; neither, *24 however, need be express, but can be inferred from acts and circumstances.”
See also, Lang v. Rickmers, supra; State Life Ins. Co. of Indiana v. Little, Tex.Civ.App., 264 S.W. 319, wr. ref.; McAdow Motor Co. v. Luckett, Tex.Civ.App., 131 S.W.2d 267, no wr. hist.; Littlejohn v. Johnson, Tex.Civ.App., 332 S.W.2d 439, no wr. hist.
The opinions in the cases above cited disclose varying factual situations, but the rules of law deduced therefrom are capable of being stated clearly, although their application may present difficulty. In a transaction where a check is given in exchange for property, the title received by the purchaser is not necessarily conditioned upon the check’s being paid by the bank upon which it is drawn. The cases speak of a check being delivered unequivocally. This means that the property was sold unconditionally with the understanding that the title should then pass. This understanding or intention may be shown not only by direct evidence but may be inferred from circumstances giving rise to a reasonable inference that title was to pass upon delivery of the property.
The circumstances above mentioned if taken singly or in part only might not be sufficient to support a theory of unconditional delivery; but a jury would be entitled to consider all of them and draw the inference that because of their past relationship, Kinsel had no doubts as to the worth of Wiley’s check; that he accepted it in payment for the cattle which he delivered and then proceeded to use the check to make a payment upon the debt owed by him to the credit association. Kinsel may have been overtrusting, and certainly he was careless as to his own welfare. Anyone familiar with the check-bill of sale procedure, who deliberately agreed to accept an ordinary check for an amount as large as $17,451.02, must have had great confidence in the maker of the check and a jury would be authorized to so conclude.
This is undoubtedly a hard case, as-are all cases where one of two innocent parties must suffer because of the fraud: of a third party, but we are convinced that, the record discloses genuine fact issues.
In view of our holding upon the point discussed, it is not necessary to consider the question of estoppel mentioned in the briefs. The record upon another trial probably will be more complete than that now before us, and a consideration of such matters now would be of little assistance to the trial judge in conducting another trial.
SMITH, CULVER and WALKER, JJ., dissenting.
STEAKLEY, J., disqualified and not sitting.

. The appeal was transferred from the Fourth to the Eleventh Supreme Judicial District upon an equalization of the dockets of the Courts of Civil Appeals in accordance with the provisions of Article 1738, Vernon’s Ann.Tex.Stats.